2022R00292/ASP

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Rukhsanah L. Singh |
| v. | : | Magistrate. No. 24-14000 (RLS) |
| BRIAN COMBS | : | **CRIMINAL COMPLAINT** |

I, Eugene Taylor, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

s/ Eugene Taylor

---

Eugene Taylor, Special Agent
Federal Bureau of Investigation

Attested to by telephone pursuant to F.R.C.P. 4.1(b)(2)(A) on this 1st day of February 2024, in the District of New Jersey.

---

Hon. Rukhsanah L. Singh
United States Magistrate Judge

**RECEIVED**
FEB 1 - 2024
AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

## ATTACHMENT A

### Counts One through Three
### (Wire Fraud)

From in or about April 2018 through in or about December 2023, in the District of New Jersey, and elsewhere, the defendant,

### BRIAN COMBS,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as set forth below, each instance constituting a separate count of this Complaint.

| Count | Approximate Date | Description of Wire Transmission |
|---|---|---|
| One | April 14, 2021 | COMBS sent Victim-1 an interstate email communication through Yahoo Inc., in which COMBS made material fraudulent representations regarding ownership of a Mickey Mantle baseball trading card |
| Two | May 3, 2021 | Victim-2 sent COMBS an interstate electronic payment in the amount of $87,000 from a Wells Fargo Bank account in New Jersey to a U.S. Bank account in Washington |
| Three | January 8, 2022 | Victim-3 sent COMBS an interstate electronic payment in the amount of $9,702.88 from a Wells Fargo Bank account in New Jersey to an account held by E-Commerce Website 1 in California |

In violation of Title 18, United States Code, Section 1343.

## ATTACHMENT B

I, Eugene Taylor, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have knowledge of the facts set forth below as a result of my participation in this investigation as well as from my review of reports, documents, and other evidence from, and discussions with, other law enforcement personnel. Where statements of others are related herein, they are related in substance and in part. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Background of the Scheme to Defraud

1. From in or about April 2018 through in or about December 2023, defendant Brian Combs ("COMBS") fraudulently induced multiple victims to pay him hundreds-of-thousands-of-dollars or provide valuable goods in exchange for items COMBS misrepresented he owned. After receiving payment in money or goods from his victims, COMBS purposely failed to deliver the promised items, while keeping for his own enrichment and personal gain the victims' money and goods.

### Relevant Parties and Entities

2. At all times relevant to this Complaint:

   a. Defendant COMBS was a resident of Durham, North Carolina and/or Fishers, Indiana.

   b. "Victim-1" was a resident of Old Bridge, New Jersey.

   c. "Victim-2" was a resident of Short Hills, New Jersey.

   d. "Victim-3" was a resident of Teaneck, New Jersey.

   e. "E-Commerce Website 1" was an American, multinational e-commerce company headquartered in San Jose, California, focused on, among other services, e-commerce.

   f. "Testing Laboratory 1" was an American, multinational company comprised of a network of testing laboratories headquartered in Cinnaminson, New Jersey, that provided, among other things, analytical testing services of precious metals.

g. Email communications sent through Yahoo Inc. ("Yahoo") during the relevant period from a Yahoo user located in New Jersey necessarily involved communications between New Jersey and a Yahoo email server located outside of the state of New Jersey.

### Overview of the Scheme to Defraud

3. From at least as early as in or about April 2018 through in or about December 2023, COMBS knowingly and intentionally devised and intended to devise a scheme and artifice to defraud Victim-1, Victim-2, Victim-3, and others (the "Victims") to pay hundreds-of-thousands-of-dollars (and on at least one occasion, to send a valuable good) in exchange for items COMBS purported to own and possess, but which he did not actually own or possess.

### Goal of the Scheme to Defraud

4. The goal of the scheme to defraud was for COMBS to enrich himself by fraudulently negotiating sales of valuable and rare items which he knew he did not own or possess with unsuspecting Victims, who believed COMBS would deliver these items once the Victims had made payment.

### Manner and Means of the Scheme to Defraud

5. It was part of the scheme to defraud that COMBS advertised the sale of various goods on at least three consumer-to-consumer e-commerce websites. Generally, after connecting with one of the Victims on one of these e-commerce websites, COMBS began communicating with the particular Victim about the proposed transaction by email, text message, and/or telephone call.

6. It was further part of the scheme to defraud that generally, the items which COMBS fraudulently represented he owned or possessed included, but were not limited to, rare bottles of whiskey, precious metals, silver coins, and a rare, collectable baseball trading card. Further, as part of the scheme to defraud, COMBS frequently requested that the Victims wire payment for these valuable and rare goods to him directly, rather than through the e-commerce website, to make it more difficult for the Victims to recover their payments when COMBS later failed to deliver the valuable and rare goods the Victims believed they had purchased. In furtherance of the scheme, COMBS often required the Victims to send confirmation of the wire transfers he fraudulently directed them to make as a condition to his knowingly false representations that he would deliver the valuable and rare item.

7. It was further part of the scheme to defraud that COMBS, after receiving payment for goods he promised to deliver to the Victims, purposely failed to send the Victims the valuable and rare items he advertised in his

communications with the Victims, or, on occasion, sent the unwitting Victims substitute items that COMBS knew were significantly lower in value than the items which he had advertised for sale.

8. It was further part of the scheme to defraud that COMBS defrauded dozens of Victims of hundreds-of-thousands-of-dollars. Examples of the manner and means of COMBS's scheme are described below.

### Acts in Furtherance of the Scheme to Defraud

### VICTIM-1

9. In or around March 2021, after connecting with COMBS on E-Commerce Website 1, Victim-1 agreed to trade approximately seven (7) ounces of the precious and rare metal Rhodium, which had a market value of approximately $210,000, for a graded Mickey Mantle baseball trading card (the "baseball card"), which in an e-mail COMBS had represented to Victim-1 he owned. Before fraudulently representing he would trade the baseball card for Victim-1's Rhodium, COMBS emailed Victim-1 two photographs of the baseball card that COMBS purported to own. Among other details, the photographs depicted an identification number on the baseball card establishing the card's authenticity, and, therefore, its rare status and high value. Valuable and rare baseball trading cards like the baseball card can be authenticated as genuine and distinguished from counterfeit cards by certain markings including unique serial numbering printed on the cards.

10. After the parties negotiated the material terms of the transaction, COMBS and Victim-1 agreed to ship to one another their respective items, that is Victim-1's Rhodium and the baseball card, on the same day with a shipping speed of same-day delivery.

11. On or about April 14, 2021, the date the parties had agreed to ship their items same-day delivery, COMBS emailed Victim-1 a United States Postal Service ("USPS") tracking number, falsely purporting to confirm he had shipped the baseball card to Victim-1. As further agreed between the parties, Victim-1, on or about April 14, 2021, relying upon COMBS's material representation that he had shipped the baseball card, shipped by USPS next-day delivery the Rhodium to COMBS.

12. Victim-1 never received the baseball card, and records from USPS confirmed that COMBS never provided USPS with a package for delivery corresponding to the tracking number COMBS fraudulently provided to Victim-1. Moreover, as part of the investigation, law enforcement confirmed that COMBS at no point owned or possessed the baseball card bearing the unique identification number depicted in the photographs COMBS had emailed to Victim-1.

13. During a voluntary interview with law enforcement, COMBS admitted, in sum and substance and among other things, that he never owned or possessed the baseball card.

## VICTIM-2

14. In or around May 2021, after connecting with COMBS on E-Commerce Website 2, Victim-2 agreed to purchase a rare and valuable bottle of Macallan Red Collection whiskey (the "whiskey") for approximately $87,000 from COMBS. Before agreeing to purchase the whiskey, COMBS and Victim-2 spoke on several occasions by telephone, during which COMBS told Victim-2 that he (COMBS) was a Macallan Red Ambassador, a title COMBS used knowing that it likely would persuade Victim-2 of COMBS's knowledge and credibility in the rare liquor collection industry.

15. Thereafter, COMBS provided Victim-2 with a false and fraudulent invoice for the purchase of the whiskey, further assuring Victim-2 that, once Victim-2 paid COMBS the negotiated purchase price of $87,000, he (COMBS) would send Victim-2 a tracking number from Commercial Interstate Carrier 1, thereby purportedly establishing that COMBS had shipped the whiskey.

16. On or about May 3, 2021, Victim-2 wired $87,000 to COMBS in exchange for the whiskey. After Victim-2 wired payment to COMBS, COMBS purposely failed to send Victim-2 a tracking number or the whiskey COMBS had fraudulently promised to deliver to Victim-2.

17. The Macallan distillery, producer of the whiskey, subsequently confirmed to law enforcement that the company does not have designated "Red Ambassadors" and that the company neither knew of or maintained any professional or licensing relationship with COMBS.

18. During a voluntary interview with law enforcement, COMBS admitted, in sum and substance and among other things, that he never owned or possessed the whiskey.

## VICTIM-3

19. In or around January 2022, after connecting with COMBS on E-Commerce Website 1, Victim-3 agreed to purchase seventy (70) grams of Rhodium for $9,702.88 from COMBS. While negotiating the material terms of the transaction over E-Commerce Website 1, COMBS falsely represented to Victim-3 that the Rhodium he advertised for sale was 99.9% pure Rhodium. Further, COMBS sent Victim-3 a letter purportedly issued by an analytical testing laboratory ("Testing Laboratory 1") stating that the Rhodium tested 92 to 99.9% pure. As COMBS knew at the time of delivery to Victim-3, the letter was false and had not been issued by Testing Laboratory 1.

20.     On or about January 8, 2022, Victim-3 wired $9,702.88 to COMBS's E-Commerce Website 1 account for the Rhodium. In turn, COMBS sent Victim-3 an item COMBS fraudulently represented to be the 99.9% pure 70 grams of Rhodium. Upon receipt of the item purporting to be the 99.9% pure Rhodium, Victim-3 submitted the item to a precious metal dealer for testing. The results of that testing indicated that the item COMBS had sent Victim-3 purporting to be 99.9% pure Rhodium was instead chromium and magnesium, metals of significantly lesser value than the rare precious metal Rhodium, and not the item that COMBS had represented he would be delivering to Victim-3 in exchange for $9,702.88.

21.     Shortly after receiving the report from the precious metal dealer, Victim-3 contacted COMBS complaining that the item COMBS delivered was not the 99.9% pure Rhodium that COMBS had represented he would deliver to Victim-3. In an email response to Victim-3's complaint, COMBS agreed to send Victim-3 additional Rhodium to replace the non-conforming product COMBS had delivered to Victim-3.

22.     On or about February 8, 2022, Victim-3 received an empty package which bore COMBS's name and address as the sender. Victim-3 complained again to COMBS. In response to this second complaint from Victim-3 about the delivery of a nonconforming item, COMBS promised to send yet another package with the Rhodium Victim-3 had agreed to purchase, that is the 99.9% pure Rhodium. In addition to promising to send the conforming Rhodium, COMBS also provided Victim-3 with a tracking number for the package COMBS represented he would be sending to Victim-3. However, COMBS purposely failed to send Victim-3 the 99.9% pure Rhodium COMBS had fraudulently promised to deliver to Victim-3.

23.     After further complaints from Victim-3, COMBS agreed to refund Victim-3 the amount of $9,702.88. However, COMBS purposely never refunded Victim-3 any money paid for the Rhodium.

24.     Testing Laboratory 1 subsequently confirmed to law enforcement that the certification letter COMBS sent to Victim-3, as discussed in paragraph 19, above, was not authentic and had never been issued by Testing Laboratory 1.

25.     The email communications referenced in Count One and the financial transactions referenced in Counts Two and Three each represent electronic transmissions that travelled in interstate or foreign commerce.